**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| PATRICIA MCLAMB, | * | |
| Plaintiff, | * | |
| | * | |
| v. | | Case No. 8:23-cv-03365-AAQ |
| | * | |
| DARRELL TERRY, et al., | * | |
| Defendants. | * | |

******

**MEMORANDUM OPINION AND ORDER**

This is a case about a county building inspector, Defendant Darrell Terry, who allegedly requested sexual favors from Plaintiff Patricia McLamb in exchange for removing an administrative barrier to Plaintiff's construction project. Throughout its life, this case has involved disputes over varying degrees of alleged bureaucratic incompetence. Court decisions and the parties' litigation choices have narrowed the case's scope, and it now centers on the alleged sexual quid pro quo.

Pending before the Court is Defendant Darrell Terry's Motion for Summary Judgment. ECF No. 47. The Motion has been fully briefed, and a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2025). Plaintiff's remaining claims are gross negligence, abuse of process, and intentional infliction of emotional distress (IIED), all Maryland tort claims asserted against Defendant. Because Plaintiff's abuse-of-process claim implicates only regulatory action and not court process, it is precluded by Maryland law and is therefore dismissed. Plaintiff's IIED claim also fails because she has not produced sufficient evidence of

severely disabling emotional distress. As for her gross-negligence claim, Plaintiff has produced evidence that could support a reasonable jury verdict in her favor. Accordingly, for the reasons stated above and hereinafter, Defendants' Motion shall be granted, in part, and denied, in part.

## BACKGROUND

In 2018, Plaintiff purchased a residential property in the city of Mount Rainier, Maryland, intending to remodel the existing house to live in with her adult daughter, who has a disability and uses a wheelchair. ECF No. 53-1 ¶ 4. Plaintiff hired Anthony Frazier—an experienced licensed architect—to design the project, including by preparing a site plan for submission to local permitting authorities. *Id.* ¶ 5; ECF No. 53-3, at 8–9. Between March 2019 and November 2021, the Prince George's County Department of Permitting, Inspections and Enforcement ("DPIE") issued several permits for the project and approved the site plan. ECF No. 53-1 ¶ 6. The site plan authorized Plaintiff to demolish three of the four first-floor exterior walls and to add a second story. *Id.* ¶ 7. The south wall was to remain in place. ECF No. 53-6, at 2, 6–7. The City of Mount Rainier's Design Review Board also approved the site plan and issued Plaintiff a building permit. ECF No. 53-1 ¶ 8.

In line with the approved site plan, Plaintiff began demolition in January 2022. *Id.* ¶ 9. On January 14, 2022, Mount Rainier code officials ordered Plaintiff to stop work on the property. *Id.* ¶ 10. Plaintiff asserts that the city officials' order was errantly premised on noncompliance with her building permit. ECF No. 53-2, at 10–11. At the time, Plaintiff had demolished two of the four exterior walls—the front and south walls remained standing. ECF No 53-1 ¶ 10. Plaintiff asked the city officials for permission to secure the south wall before stopping work to

prevent it from collapsing. *Id.* ¶ 11. The officials refused; subsequently, a portion of the wall collapsed.[1] *Id.* ¶¶ 11–12.

On January 19, 2022, after the south wall had partially[2] collapsed, Defendant visited the property along with another inspector. *Id.* ¶ 13; ECF No. 47-3, at 35–36. Defendant allegedly raised several concerns that Plaintiff contends were unfounded. ECF No 53-1 ¶ 13. For example, Defendant allegedly claimed that Plaintiff lacked a temporary electrical permit, after which the other inspector checked DPIE's system and confirmed that Plaintiff had the proper electrical permit. *Id.*; *see also* ECF No. 53-8 (electrical permit). Plaintiff testified that Defendant "refused to review" the permits posted at the property and "refused to speak to [Plaintiff's] architect and told [Plaintiff] that [she] should fire [her] architect because [she] only needed [Defendant]." ECF No. 53-1 ¶ 13. Defendant then allegedly asked the other inspector to leave before issuing Plaintiff a stop-work order and a correction order. *Id.* ¶ 14. The correction order directed Plaintiff to: 1) obtain "raze permit for house taken down to foundation;" 2) "revise permit from 2nd floor addition to permit for new single-family dwelling;" and 3) "obtain sprinkler permit." ECF No. 53-9. Defendant testified that these corrective actions were necessary because the wall collapse had changed the scope of the project. ECF No. 47-3, at 55–56. He testified that it did not matter whether the wall collapse was attributable to the city officials' actions or to Plaintiff's—he would have issued the orders regardless. *Id.*

[1] The wall collapse damaged a fence belonging to the mayor of Mount Rainier, Plaintiff's neighbor. ECF No. 53-2, at 26. At the mayor's request, Plaintiff gave the mayor $50 to repair the fence. *Id.*

[2] Defendant Terry testified that, when he arrived, only a portion of the front wall remained standing, and the south wall "was not intact." ECF No. 47-3, at 35, 41.

Shortly after Defendant issued the stop-work order, Mr. Frazier exchanged emails with DPIE officials. ECF No. 53-18. George Holmes, Assistant Associate Director of DPIE's inspections division, referred Mr. Frazier to Nabeel Waseem, the Division Chief for DPIE's Building Plan Review Division. ECF No. 53-18, at 2–3. Mr. Waseem emailed Mr. Frazier outlining the steps "required to proceed," including submission of revised plans, a copy of the correction notice, and a narrative letter explaining the reason for the permit revision. *Id.* at 2. Mr. Waseem stated that he would "expediate" the review once Mr. Frazier submitted the required materials. *Id.* Mr. Waseem's email did not discuss sprinklers or a raze permit. *Id.*

Mr. Frazier then submitted revised plans to DPIE. ECF No. 53-1 ¶ 16. The revised plans initially provided for the inclusion of sprinklers, but DPIE requested that the sprinklers be removed from the plans. ECF No. 53-2, at 11. DPIE internally approved the revised plans but did not issue a revised permit because the stop-work order that Defendant issued remained in place. ECF No. 53-1 ¶ 17; ECF No. 53-12; ECF No. 53-14, at 4. Plaintiff never applied for a raze permit, contending that a raze permit was not necessary because a portion of the structure remained standing. ECF No. 53, at 17; ECF No. 53-2, at 29.

The stop-work order remained in place throughout the ensuing months. ECF No. 53-1 ¶ 18. During which time, Plaintiff and Mr. Frazier communicated with multiple DPIE officials about how to continue the project. ECF No. 53-1 ¶¶ 19–26; ECF No. 53-3, at 29. According to Plaintiff, on July 13, 2022, DPIE Inspector Kenneth Harrison informed Plaintiff during a phone call that the County would place a lien on her property and that she would incur fines of at least $1,000 per day for ongoing building violations. ECF No. 53-2, at 7, 19; ECF No 53-1 ¶ 19. Mr. Harrison told Plaintiff that she should speak with Defendant to resolve these problems. ECF No.

53-1 ¶ 19. Plaintiff testified that "immediately after the call from Harrison," Defendant called her and, "[i]n a threatening tone," reiterated Mr. Harrison's warnings, telling Plaintiff the County would "take . . . away" her home. *Id.* ¶ 22; ECF No. 53-2, at 7. Plaintiff states that she began to cry and that Defendant then told Plaintiff she should fire her architect and asked Plaintiff whether she "wanted to have a home to live in with [her] disabled daughter, a place where she could have everything within reach and where the two of [them] could live peacefully." *Id.* ¶¶ 22–23. He allegedly proceeded to tell Plaintiff that if she wanted the stop-work order lifted, she needed to be "on good terms with Mr. Johnson." *Id.* ¶ 23. Plaintiff thought Defendant was referring to someone who could resolve the permitting issues, so she asked him for "Mr. Johnson's" contact information. *Id.* ¶ 24. Plaintiff testified that Defendant then gave her two telephone numbers while using a "mocking tone." *Id.*

Still under the assumption that "Mr. Johnson" was a person who could help, Plaintiff gave the phone numbers to Mr. Frazier, but the numbers allegedly did not lead to individuals involved with Plaintiff's project. *Id.* ¶ 25. Plaintiff testified that Mr. Frazier located the only "Johnson" then working in DPIE's Inspections Division, who told Plaintiff and Mr. Frazier that he had no involvement in the matter and did not know why Defendant had referenced him. *Id.* On August 19, 2022, after a conference call between Plaintiff and various DPIE officials, Defendant again allegedly spoke privately with Plaintiff and told her that everything could easily be resolved if Plaintiff did "what I told you before, speak with Mr. Johnson." *Id.* ¶ 26. Plaintiff then reached out to another acquaintance, Paul Jajan, to seek help locating Mr. Johnson. *Id.* ¶ 27; ECF No. 53-4, at 11–14. Mr. Jajan told Plaintiff that he believed "Mr. Johnson" was a slang term for male genitalia and that by using that term, Defendant was soliciting sexual favors from Plaintiff in

exchange for lifting the stop-work order. ECF No. 53-1 ¶ 27; ECF No. 53-4, at 12–15. Around that same time, Plaintiff had a similar conversation with Mr. Frazier, who also informed Plaintiff that "Johnson" was a slang term for male genitalia. ECF No. 53-3, at 48–49.

Some time prior to September 21, 2022, Plaintiff sought therapeutic treatment for emotional distress stemming from her interactions with Defendant. ECF No. 53-1 ¶ 33; ECF No. 53-17. In a letter dated September 21, 2022, Plaintiff's therapist, Katrina Mitchell, documented the "Mr. Johnson" comments and observed:

> I have been working with my client with [sic] to address the anxiety and depression she has suffered in part due to her interactions with Inspector Terry. She has reported to me numerous times where she believed that her engagement with the inspector has been sexist. If not, sexual in nature. She has talked with me about the anxiety she experiences when she must communicate with Inspector Terry. She is often tearful and experiencing high level of anxiety as a result. She has even asked the inspector to communicate with her architect, but he insists on specking [sic] with her.

ECF No. 53-17. Another mental-healthcare provider, Shani Banks, treated Plaintiff from 2021 to 2022, and again in December 2025. ECF No. 53-16. Banks documented Plaintiff's "persistent symptoms consistent with Major Depressive Disorder" and observed that "the clinical impression is that [Plaintiff's] depression is the result of her being the target of perceived adverse discrimination or persecution." ECF No. 53-16.

Plaintiff and Mr. Frazier continued to engage with DPIE officials. Plaintiff unsuccessfully sought to submit a complaint about Defendant's alleged behavior. ECF No. 53-1 ¶¶ 29–31. On December 27, 2022, Mr. Frazier emailed then-Director of DPIE Melinda Bolling, explaining some of the difficulties Plaintiff had experienced with DPIE. ECF No 53-19, at 13–14. This set off a string of email exchanges between various DPIE officials in which the officials expressed

confusion and disagreement as to whether Plaintiff had sufficiently addressed the conditions outlined in the correction order and thus whether the stop-work order should have been lifted. ECF No. 53-14; ECF No. 53-19. The confusion and disagreement involved officials who outranked Defendant. ECF No. 53-14; ECF No. 53-19; ECF No. 47-3, at 158–159. For example, then-DPIE Director Melinda Bolling asked Defendant whether the stop-work order prevented Mr. Frazier from applying for permits. ECF No. 53-19, at 4. Despite the involvement of higher-ranking officials, Defendant testified that he had sufficient authority to lift the stop-work order, ECF No. 47-3, at 153.

Defendant contends that DPIE records from 2024 show additional permitting issues related to Plaintiff's property, including unpaid fees for an interior-renovation permit. ECF No. 47-1, at 9 (citing ECF No. 47-5; ECF No. 47-6; ECF No. 47-7; ECF No. 47-8). Plaintiff claims that these fees related to an interior-renovation permit for a different property with a similar address and that she never performed interior-renovation work at the subject property. ECF No. 53, at 11; ECF No. 53-2, at 12, 17.

Plaintiff claims that Defendant's refusal to lift the stop-work order caused Plaintiff to suffer economic damages due to increased construction costs, lost rental income, fines and fees, and additional financing costs. ECF No. 53-1 ¶ 35. Plaintiff's forensic-accounting expert opined that these damages amount to approximately $547,057.00. ECF No. 53-26, at 1–2. Plaintiff also asserts that she suffered compensable emotional distress. ECF No. 53-1 ¶ 35. Altogether, Plaintiff alleges damages of $702,791.12. *Id.*

On December 12, 2023, Plaintiff filed a Complaint against the City of Mount Rainier, two city officials, Prince George's County, and Defendant. ECF No. 1. On January 18, 2024, the

County and Defendant filed an Answer. ECF No. 10. The City and the city officials filed a Motion to Dismiss on February 12, 2024. ECF No. 13. The Honorable Deborah K. Chasanow—who then presided over the case—granted the Motion to Dismiss on September 6, 2024, and provided Plaintiff twenty-one days to file a Motion for Leave to Amend. ECF No. 18; ECF No. 19. On September 27, 2024, Plaintiff filed a Motion for Leave to Amend, eliminating her claims against the City and the County and amending her claims against the city officials and Defendant. ECF No. 20. The Amended Complaint included four counts against Defendant: Gross Negligence (Count II), Abuse of Process (Count III), Intentional Infliction of Emotional Distress ("IIED") (Count IV), and a violation of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(c) (Count V). ECF No. 25 ¶¶ 72–101. Defendant did not file a response in opposition to the Motion for Leave to Amend. Judge Chasanow denied Plaintiff's Motion as to the counts against the city officials, preserving only the counts against Defendant. ECF No. 24.

On August 27, 2025, with the consent of the parties, the case was referred to the undersigned for all further proceedings. ECF No. 29; ECF No. 30; ECF No. 32. On May 14, 2026, Defendant filed a Motion for Summary Judgment, ECF No. 47, along with a Motion for an Extension of Time to file it, ECF No. 46.[3] Plaintiff filed a Response in Opposition to Defendant's Motion for Extension of Time. ECF No. 48. On May 18, 2026, the Court issued a Paperless Order directing Plaintiff to file a response addressing the substance of Defendant's Motion for

---

[3] The Court shall grant the Motion over Plaintiff's objection. ECF No. 48. Any prejudice from the extension has been obviated by the provision of an adequate opportunity for Plaintiff to respond to the substance of Defendant's Motion. *See* ECF No. 53; ECF No. 54 (granting Plaintiff's request for leave to file excess pages in support of her opposition brief).

Summary Judgment. ECF No. 49. Plaintiff filed a substantive Response in Opposition, in which Plaintiff conceded her RICO claim (Count V). ECF No. 53. Defendant filed a Reply, ECF No. 55.

**STANDARD OF REVIEW**

The Court will only grant a motion for summary judgment where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The party moving for summary judgment bears the burden of showing that there are no genuine issues of material fact. Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

**DISCUSSION**

Defendant has moved for summary judgment on all four of Plaintiff's claims. The Court grants summary judgment for Defendant on Plaintiff's now-conceded RICO claim, leaving Plaintiff's three tort claims, each of which are based on Maryland state law. Having dispensed with the only remaining federal claim in this case, the Court has discretion whether to retain supplemental jurisdiction over the Maryland tort claims. 28 U.S.C. § 1367(c)(3); *Hall v. Greystar Mgmt. Servs., L.P.*, 179 F. Supp. 3d 534, 536 (D. Md. 2016). Neither party opposes this Court's

exercise of supplemental jurisdiction, and given the time and resources already expended on this case, "convenience and fairness to the parties" counsel in favor of retention. *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). The Court will thus rule on the state-law tort claims.

**I. Abuse of Process**

Although Maryland prohibits abuse of process, the prohibition does not apply in the specific context of this case. Under Maryland law, the abuse-of-process tort is premised on "a perversion of court process to accomplish some end which the process was not designed to accomplish." *Att'y Grievance Comm'n v. Roberts*, 904 A.2d 557, 571 (Md. 2006) (quoting *Capitol Elec. Co. v. Cristaldi,* 157 F. Supp. 646, 648 (D. Md. 1958)). Plaintiff bases her claim on Defendant's alleged misuse of the County permitting system to coerce sexual favors from Plaintiff. While the facts alleged here may meet some of the required elements, this District has observed that "Maryland law does not provide for an abuse of process claim within the context of regulatory action." *Driver Opportunity Partners I, LP v. First United Corp.*, No. 20-cv-2575, 2021 WL 82864, at *7 (D. Md. Jan. 8, 2021). Because Plaintiff has not alleged any abuse of court process, her claim cannot proceed. *Id.*

**II. Gross Negligence**

Defendant moves for summary judgment on Plaintiff's gross-negligence claim or, in the alternative, for a limitation on Plaintiff's damages as a matter of law. ECF No. 47-1, at 16–17. Maryland law defines gross negligence as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Cooper v. Rodriguez*, 118 A.3d 829, 845–46 (Md. 2015) (quoting *Barbre v. Pope*, 935 A.2d 699,

717 (Md. 2007)). To succeed on a gross-negligence claim, a plaintiff must also satisfy the traditional negligence elements, including injury and causation. *Doyle v. Prince George's County*, No. 1718, Sept. Term 2024, 2026 WL 2797074, at *7 (Md. App. Ct. Sept. 18, 2026). Whether one acted with gross negligence is an inherently fact-bound inquiry and is thus "usually a question for the jury." *Cooper*, 118 A.3d at 846 (quoting *Romanesk v. Rose*, 237 A.2d 12, 14 (Md. 1968)). Gross negligence is about "quality," not "quantity." *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 422 (D. Md. 2022) (quoting *Md. Jockey Club of Balt. City, Inc. v. Balt. Gas & Elec. Co.*, No. 2364 Sept. Term 2001, 2002 WL 32123994, at *10 (Md. Ct. Spec. App. Dec. 17, 2002)). In other words, a plaintiff cannot stack multiple acts of ordinary negligence to clear the gross-negligence bar. *Maryland Jockey Club*, 2002 WL 32123994, at *10. Public-official immunity—under both the common law and the Maryland Tort Claims Act—does not apply to acts of gross negligence. *Cooper*, 118 A.3d at 846, 849.

Defendant has failed to demonstrate that the facts are "so clear as to permit a conclusion as a matter of law" on Plaintiff's gross-negligence claim. *Id.* at 846. Defendant concedes that a genuine factual dispute exists as to whether Defendant made the alleged statements regarding "Mr. Johnson" but argues that summary judgment is nevertheless appropriate. ECF No. 55, at 2, 12. Defendant characterizes the underlying facts as a "genuine permitting dispute" involving multiple DPIE officials and asserts that the involvement of other officials precludes liability. ECF No. 55, at 4–5. His arguments sound in both causation and recklessness: Plaintiff would have faced the same regulatory obstacles without Defendant's involvement, and a plausible regulatory justification precludes a recklessness finding. *Id.* at 12. A jury, however, must resolve these arguments.

The "Mr. Johnson" comments, if credited by a jury, could establish causation. Defendant allegedly told Plaintiff that "everything could be resolved easily" if she "[spoke] with Mr. Johnson." ECF No. 53-1 ¶ 26. A reasonable jury could take these comments to mean that the only thing standing in the way of Plaintiff's project was Defendant's demand for sexual favors. After all, Defendant himself imposed the stop-work order and had sufficient authority to lift it. While the emails showing disagreement among DPIE officials muddy the waters, they do not conclusively resolve the matter in Defendant's favor. As Defendant concedes, the emails do not establish that his position on the stop-work order "necessarily was right." ECF No. 55, at 5. Moreover, the emails show high-ranking DPIE officials—including then-Director Melinda Bolling—deferring to Defendant's regulatory judgment and findings. ECF No. 53-19, at 4, 10. A reasonable jury could thus conclude that Defendant caused the stop-work order to remain in place.

Similarly, a reasonable jury could determine that the "Mr. Johnson" comments establish recklessness. If true that the only reason Defendant maintained the stop-work order was to coerce sexual favors from Plaintiff, then he clearly acted with reckless disregard for the consequences to Plaintiff's property by leveraging his permitting power for illicit purposes. Even if there were some legitimate regulatory justifications for the stop-work order, Defendant allegedly obscured the necessary remedial steps by telling Plaintiff that "*all [she] had to do* was . . . 'speak with Mr. Johnson.'" ECF No. 53-1 ¶ 26 (emphasis added). If the record is clear about anything, it is that the DPIE permitting process is opaque and complex. Even the highest-ranking official at DPIE exhibited confusion as to how to navigate the process. ECF No. 53-19, at 4. To be sure, "bureaucratic mismanagement and incompetence" alone do not establish gross negligence. *Wells*

*v. State*, 642 A.2d 879, 885 (Md. Ct. Spec. App. 1994). It is one thing to allow bureaucratic incompetence to persist. It is quite another to weaponize that incompetence to obtain sexual favors.

Gross negligence has been described as "the omission of that care which even inattentive and thoughtless men never fail to take." *Coughlan ex rel. Bannon v. Balt. & Ohio R.R. Co.*, 24 Md. 108, 124 (1866) (citation modified); *Wells*, 642 A.2d at 883 (same). An inattentive permitting official may have ignored Plaintiff and left her to navigate the permitting process on her own. That would not have been gross negligence. Defendant, however, allegedly did more by actively obscuring—or creating—administrative hurdles for illegitimate ends.[4] Such acts would cross from mere inattentiveness to a clear violation of "good faith" and would imply "evil intention." *Wells*, 642 A.2d at 883–84 (citation modified). A reasonable jury could find that Defendant intentionally failed to perform his duty to serve the public in good faith,[5] recklessly disregarded Plaintiff's property rights, and thereby caused Plaintiff injury.

---

[4] Plaintiff also contends that Defendant's permitting decisions constitute gross negligence independently of the "Mr. Johnson" comments. ECF No. 53, at 9. If the permitting decisions were merely wrong, and not leveraged for illicit purposes, they would not rise to the level of gross negligence. *Wells*, 642 A.2d at 885. Even so, the correctness of Defendant's regulatory decisions may be relevant. A jury finding that no regulatory basis existed for maintaining the stop-work order would tend to establish that Defendant was not acting in good faith. *Id.* at 884. Defendant wrongly asserts, ECF No. 55, at 3, that Plaintiff's gross-negligence pleading failed to include the permitting decisions themselves. Plaintiff's Amended complaint states: "The Code Enforcement Defendants," a group defined to include Defendant Terry, "breached their duty of care when they recklessly prevented Ms. McLamb from performing the permitted construction and demolition work on the Subject Property, namely though the issuance of unreasonable orders and baseless citations." ECF No. 25 ¶¶ 51, 76.

[5] Prince George's County employees "may not intentionally use the prestige of his office for his own private gain or that of another." Prince George's Cnty., Md., Code § 2-293(c) (2026).

Defendant argues that, even if Plaintiff's gross-negligence claim survives summary judgement, it should be narrowed to exclude "the correction order itself, the requirement of revised plans, the failure to lift the stop-work order absent documented approval, or the disputed need for raze/new-construction review," as well as damages stemming from the actions of other officials.[6] ECF No. 47-1, at 17–18. The Court agrees with respect to the initial correction order and the requirement for revised plans. DPIE officials shared an agreement that *some* revision to the plans was necessary after the south wall partially collapsed, regardless of who was responsible for the collapse. ECF No. 53-18, at 2–3. Plaintiff concedes that her "theory does not rest on [Defendant's] initial issuance of the Correction Order and Stop Work Order" but rather on Defendant's "persistence in a Stop Work Order he know blocked an approved permit." ECF No. 53, at 24. At trial, Plaintiff will thus be limited to proving damages stemming from Defendant's conduct after DPIE approved the revised plans on or about March 31, 2022, ECF No. 53-12, at 3. Defendant's remaining requests to narrow the claim are not warranted at this stage. For the reasons discussed above, a reasonable jury could conclude that Defendant wrongly held in place the stop-work order as a means of coercing Plaintiff to provide sexual favors. Moreover, the apportionment of harm between multiple actors must be conducted by a jury, as the record presents genuine factual disputes over Defendant's role.

## III. Intentional Infliction of Emotional Distress

[6] Defendant also argues, briefly, that Plaintiff failed to mitigate damages because she "did not meaningfully pursue formal administrative remedies." ECF No. 47-1, at 18. This broad, conclusory assertion does not satisfy Defendant's burden to show that Plaintiff "failed to use 'all reasonable efforts to minimize the loss he or she sustained.'" *Cave v. Elliott*, 988 A.2d 1, 19 (Md. Ct. Spec. App. 2010).

To prove her IIED claim, Plaintiff must show that Defendant: 1) engaged in conduct that was "intentional or reckless;" 2) that the conduct was "extreme and outrageous;" 3) that there was "a causal connection between the wrongful conduct and the emotional distress;" and 4) that the emotional distress was "severe." *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 74–75 (Md. 1991). Liability for IIED "should be imposed sparingly." *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011). Defendant argues that the record does not support the second, third, and fourth elements. ECF No. 47-1, at 15. While Plaintiff has produced sufficient evidence for the second and third elements, she has failed to do so with respect to the fourth.

### A. Extreme and Outrageous

To satisfy the "extreme and outrageous" requirement, the "conduct must completely violate human dignity," and "strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. 1986). Courts consider multiple factors when analyzing the "extreme and outrageous" element, "including the context in which the conduct occurred, the personality of the plaintiff and her susceptibility to emotional distress, and the relationship between the defendant and plaintiff." *Brengle*, 804 F. Supp. 2d at 453. "In cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts." *Harris v. Jones*, 380 A.2d 611, 615 (Md. 1977) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 12, at 56 (4th ed. 1971)). Thus, the "abuse of a position," particularly a position with "power to affect [the plaintiff's] interests," can amount to extreme and outrageous conduct. *Id.* at 616. Conduct resembling "extortion" is especially likely to meet this standard.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 12, at 61 (5th ed. 1984) [hereinafter Prosser and Keeton].

While this standard is difficult to meet, the record contains evidence that could support a jury finding of extreme and outrageous conduct. A reasonable jury could determine that: Defendant called Plaintiff on at least two occasions during a time in which Plaintiff faced significant personal and financial vulnerability; heard Plaintiff crying about her frustrations with the permitting system; used Plaintiff's desire to provide for her disabled daughter as emotional leverage; sought to isolate Plaintiff from her architect, who had been supporting her through the process; and demanded sexual favors in exchange for allowing her project to proceed. This set of circumstances, if true, amounts to extreme and outrageous conduct. Defendant allegedly "abuse[d]" his "power to affect [Plaintiff's] circumstances," *Harris*, 380 A.2d at 616, in a manner resembling "extortion" for sexual favors, Prosser and Keeton § 12, at 61, while manipulating Plaintiff's particular vulnerabilities and "susceptibility to emotional distress," *Brengle*, 804 F. Supp. 2d at 453.

**B. Causation**

Plaintiff must prove emotional distress that was "proximately caused by [Defendant's] tortious conduct." *Figueiredo-Torres*, 584 A.2d at 76. A plaintiff's "pre-existing susceptibility to emotional distress does not necessarily preclude liability if it can be shown that the conduct intensified the pre-existing condition of psychological stress." *Harris*, 380 A.2d at 616 n.2.

Defendant's efforts to break the causal chain fail. Defendant argues that "Plaintiff's distress also arises from many sources: the City's stop-work activity, the wall collapse, inability to complete construction, continuing municipal citations, financial pressure, and the property's

unresolved condition." ECF No. 47-1, at 15. Putting aside the fact that Defendant plausibly played a crucial role in some of the events on this list, Plaintiff has provided evidence that directly links at least some of her distress to Defendant's alleged sexual quid pro quo. A letter from Plaintiff's therapist dated September 21, 2022—approximately one month after the second "Mr. Johnson" conversation—describes "anxiety and depression that she has suffered in part due to her interactions with Inspector Terry," namely interactions that Plaintiff described as "sexist" or "sexual in nature." ECF No. 53-17. A later letter from a mental-healthcare provider links Plaintiff's symptoms to experiences of "harassment." ECF No 53-16. Additionally, Plaintiff's declaration states that she specifically sought treatment from these providers "for the emotional distress that [Defendant's] conduct caused [her]." ECF No 53-1 ¶ 33. Even assuming Plaintiff's emotional distress was partly caused by other experiences, a reasonable jury could conclude that her symptoms were "intensified" by Defendant's alleged misconduct.

**C. Severity**

While Plaintiff has met the other elements of an IIED claim, she has not produced specific evidence that she "suffered a severely disabling emotional response to the defendant's conduct[;]" thus, her claim ultimately fails. *Harris*, 380 A.2d at 616. To succeed on the "severity" element, a plaintiff need not demonstrate "total emotional or physical disablement." *B.N. v. K.K.*, 538 A.2d 1175, 1181 (Md. 1988). Still, severity must be proven with "evidentiary particulars," *Harris*, 380 A.2d at 617, which invariably involve significant disruption of one's daily life. In *Moniodis v. Cook*, for example, the plaintiff "took greater amounts of medication," "began to sleep most of the time," and "became a recluse" for a year. 494 A.2d 212, 220 (Md. Ct. Spec. App. 1985). In *Figueiredo–Torres*, the plaintiff suffered, among other things, "systemic hypertension,"

"hospitalization for severe emotional distress," and "impairment of his ability to form intimate relationships." 584 A.2d at 76. In *Brengle*, the plaintiff's distress "prevented her from attending to basic requirements of life such as having a permanent home and eating and sleeping regularly and interacting with others." 804 F. Supp. 2d at 456. Being "forced to seek therapy . . . is insufficient by itself to support an IIED claim." *Brooks v. Bd. of Educ.*, No. 20-cv-03414, 2022 WL 17968722, at *10 (D. Md. Dec. 27, 2022).

Plaintiff has not produced sufficient "evidentiary particulars." *Harris*, 380 A.2d at 617. The notes from her mental-healthcare providers describe Plaintiff becoming "tearful," "experiencing high level of anxiety," ECF No. 53-17, and presenting "persistent symptoms consistent with Major Depressive Disorder[,] . . . including dysthymia, anhedonia, fatigue, low self-esteem, and other clinically significant symptoms," ECF No. 53-16. These symptoms are certainly serious. Plaintiff has not, however, explained with specificity how these symptoms impacted her ability to "tend to daily activities," or otherwise altered her day-to-day quality of life. *Brengle*, 804 F. Supp. 2d at 455. Accordingly, her IIED claim fails.

**CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgement, ECF No. 47, is denied as to Count II (gross negligence) and granted as to Count III (abuse of process), Count IV (intentional infliction of emotional distress), and Count V (RICO violation). Additionally, Defendant's Motion for an Extension of Time, ECF No. 46, is granted.

Date: November 16, 2026

/s/
Ajmel A. Quereshi
United States Magistrate Judge